[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED JUNE 14, 1996
The instant case is an action by the plaintiff condominium to foreclose a lien against the defendants who are the owners of one of the units. The claim is that the defendants have failed to pay common charges, special assessments, late charges, interest charges and fines. The relief sought includes a judgment of strict foreclosure, an ascertainment of the debt owed including interest, costs and attorneys fees and, if appropriate, a deficiency judgment.
On the defendants' part, ownership of the unit and governance by the declaration of condominium status and the original bylaws have been admitted. Otherwise, the material allegations of the CT Page 4850 complaint are denied. In addition, the defendants have asserted three special defenses and three counterclaims.
In the first and second special defenses, the defendants allege a failure of consideration or a waiver of the right to collect condominium fees because the plaintiff has acted inequitably in appropriating such fees to uses not authorized by the by-laws or pertinent statutes. The allegations of the third special defense are that the plaintiff lacks the corporate capacity to collect fees because of a failure to comply with the by-laws and/or statutes governing the following: election of the board of directors, annual meetings of unit owners, application of annual fees to common elements or limited common elements, providing budget summaries to unit owners, ratification of budgets and repayment or crediting of surplus association funds to unit owners.
On their counterclaims, the defendants seek monetary and equitable, including injunctive relief. In the first counterclaim, the defendants claim that payment of the common charges and special assessments will unjustly enrich the plaintiff or persons posing as the plaintiff's directors in that such charges and assessments have been collected and inequitably distributed. In the second counterclaim the allegations are that special assessments have been illegally placed in a reserve fund instead of being credited or refunded to unit owners. The third counterclaim recites that the plaintiff or individuals posing as its directors refused to repair the defendants' roof, a common element of the condominium, and attempted to prevent workers hired by the defendants to repair the roof from completing their work.
Approximately ten months before trial, the plaintiff moved to strike the defendants' special defenses and counterclaims on the ground that, as a matter of law, they were insufficient to serve as defenses in this foreclosure action. The motion to strike was denied without opinion by Judge Celotto. When, at the time of trial, the motion to strike was renewed, the court decided to admit evidence relevant to the special defenses and counterclaims and determine the question of legal sufficiency later. At the same time, the court denied a motion by the defendants to join the foreclosure action with another case brought by them against the plaintiff and others wherein claims similar to the special defenses and counterclaims have been made. CT Page 4851
At the trial, the parties called witnesses and placed exhibits in evidence. From the testimonial and documentary evidence, the court finds that the facts set forth below were established.
 I.
The plaintiff condominium was established on August 13, 1981, in the Town of Branford by Anderson Wilcox Contractors, Inc. as an expandable condominium. According to General Statutes §47-68a(y) an "expandable condominium" is one to which additional land and units may be added. The declaration for Watch Hill specified a period of seven years in which expansion could be accomplished. The complex now consists of sixty units situated primarily on Jerimoth Drive and operates as a Connecticut corporation in good standing.
Linda Levin, the plaintiff's principal witness, resides at 54 Jerimoth Drive and is the state registered manager of the condominium. Article II § 3 of the plaintiffs by-laws provides for the employment of a manager and specifies the duties incidental to the position. As manager. Linda Levin maintains books and records, is in charge of common and to a certain extent limited common elements, collects common charges and special assessments, assists in the preparation of budgets and with the meetings of the plaintiff's board of directors and the owners of its units. Linda Levin also manages two other condominium complexes as an employee of Condominium Concerns, Inc., a corporation of which her husband is a director. She utilizes one room in their unit for condominium business purposes.
The defendants reside in unit No. 7 also known as 7 Jerimoth Drive. Linda Van Eck, known before her marriage as Linda Lounsbury, and her sister. Kathryn Phenix, were among the original unit owners having purchased unit No. 7 in 1981. On April 24, 1989, however, Linda Lounsbury quitclaimed her interest in unit No. 7 to Kathryn Phenix. On November 23, 1992, Kathryn Phenix and her husband. Paul, conveyed the unit to the defendants, Jan and Linda Van Eck, husband and wife. On dates prior to executing the deed with her husband, Kathryn Phenix had sent two other deeds to the defendants that for one reason or another were defective. During the period when Kathryn Phenix was the record owner of unit No. 7 common charges amounting to $575.00 had accumulated. The arrearage was discussed at a meeting of the plaintiff's board of directors held on October 31, 1991. CT Page 4852
Much of the difficulty between the plaintiff and the defendants is traceable to occurrences at the unit owners' meeting that started in January and finished in March of 1992. Article III § 3 of the by-laws requires the plaintiffs secretary to send notice to each unit owner of a meeting not less than 30 nor more than 40 days before the schedule meeting. A notice dated December 1, 1991 announced that the annual unit owner's meeting was scheduled for January 21, 1992. The notice was too early for compliance with Article III § 3. Among other things, the notice solicited nominees for the board of directors. Interested persons were requested to complete an enclosed candidate's information sheet and return it to Bill Casey, the plaintiff's then president, at unit #27 before the meeting. The notice further stated that "[c]andidates will not be taken from the floor at the meeting."
According to the notice, five directorships existed of which three were to be filled at the January 21, 1992, meeting. The number of directorships conflicts with Article II § 1(a) of the by-laws which states that "the affairs of the Condominium shall be governed by a Board of Directors consisting of three (3) persons."
The unit owners' meeting did not conclude on January 21, 1992 and divergent accounts were given as to what occurred at it. The plaintiffs version was that Jan Van Eck was nominated to be a director but that the elections were not held because the guest speaker talked too long and that the meeting was aborted when during Van Eck's presentation of his alternative budget the custodian at the Branford Community House turned off the lights. The defendants' claim was that Jan Van Eck had been both nominated and elected as a director and that he had never been removed by a majority vote of the unit owners as Article II § 4 of the by-laws requires. The defendants further claim that the election preceded the discussion where Jan Van Eck presented his alternative budget. The court finds that Jan Van Eck was nominated on January 21, 1992 but was not elected to a directorship as elections were not held on that date. This finding is based not only on what transpired subsequently but also on the agenda for the meeting which lists "budget review and ratification" as an item to be covered before the "election of directors." There was no testimony that the agenda had been varied in any way. CT Page 4853
On January 24, 1992, a notice from the board of directors and manager announced a continuance date of the annual meeting until February 6, 1992 at the Branford Community House. The continued meeting was not held on February 6, 1992 but was further postponed to March 10, 1992 at the same place to insure compliance with the by-law requirement of the not less than 30 nor more 40 days notice. Notification of the new date came in a letter dated February 3, 1992 and signed by William Casey, president. The agendas in the notices dated January 24 and February 3, 1992 listed the items to be taken up as committee reports, election of directors, new business and adjournment. These items are identical to the last four items in the agenda for January 21, 1992.
Meanwhile in the period between the original meeting date of January 21 and the continued meeting date of March 10, 1992, members of the board of directors checked the ownership of unit #7 in the Branford land records. On January 31, 1992, William Casey, as president, sent two identical letters, one addressed to Jan Van Eck, 7 Jerimoth Drive and the other addressed to John Van Eck at the same address. The letters informed Jan Van Eck that to be considered as a nominee for the board of directors, he had to be an owner. He was asked to provide information that would dispute and correct the absence of ownership shown by the land records. In their final paragraph, the letters stated that if the requested information could not be provided, Jan Van Eck's nomination would be disqualified.
Apparently the letters of January 31, 1992, went unanswered because on February 3, 1992, William Casey mailed a copy of his "Dear Jan" letter with a handwritten note at the bottom saying that clarification of Jan Van Eck's status as an owner had not been received. Jan Van Eck testified that at the continued meeting on March 10, 1992, he attempted to show William Casey and a unit owner Phil Biondi a notarized document from his sister-in-law Kathryn Phenix the record owner of unit #7 at the time but that they refused to look at it. Article II § 1(f) requires that directors be unit owners. What the document supposedly preferred by Jan Van Eck was and whether it would have established ownership in him cannot be determined as Jan Van Eck also testified that the document has been lost.
At the continued annual meeting on March 10, 1992, Jan Van Eck's name was not on the slate presented and he was not elected a director. The nominees whose names were on the slate were CT Page 4854 unanimously elected.
Notwithstanding the language of Article III § 3 of the by-laws that sending notices of annual meetings to the unit owners is a duty of the secretary of the board of directors, other persons have, in fact, always sent such notices. The notice for the annual meeting originally scheduled for January 21, 1992 was unsigned but, as heretofore mentioned, the two notices of rescheduled meetings come from the board of directors and manager and from William Casey as president. Other examples are the 1993 meeting for which the notice was signed by Linda Levin as property manager and the 1994 and 1995 meetings for which the notices were signed by Linda Levin with the description "manager, Condominium Concerns, Inc."
Notice of the 1992 annual meeting was given to the defendants at unit #7 and to Kathryn Phenix. When the defendants recorded their deed of ownership from Kathryn Phenix on November 27, 1992, they did not tell Linda Levin about the deed or its recording. As Jan Van Eck explained "we weren't speaking." A lack of knowledge of the transfer of ownership may be reason why notice of the 1993 annual meeting apparently was given only to Kathryn Phenix. For subsequent annual meetings, the defendants were notified in the same manner as formerly by the notice being placed in the mail box. Moreover, it appeared that the defendants had actual knowledge of the dates of annual meetings from sources other than Linda Levin's notices. Jan Van Eck testified that he knew from reading the by-laws (art. III § 1) that the meeting date was the third Tuesday of February and that he had attended the annual meetings in 1993 and 1994. And even if the meetings were adjourned until later dates, the defendants were, according to Linda Van Eck, able to learn when the meetings would be held from neighbors.
Part of the lien the plaintiff seeks to foreclose involves common charges that the defendants have refused to pay. Article V § 1 of the by-laws empowers the board of directors to adopt an annual budget, determine common expenses and collect common charges and to make repairs, renovations, improvements, alterations and restorations in the condominium complex. Although the notice of the 1992 annual meeting included an item for "budget review and ratification" and at the initial stage of that meeting there was a vote favoring the directors' budget over Jan Van Eck's alternative budget, there is no authority in the by-laws that permits the unit owners to override the board of CT Page 4855 directors in budgetary matters. Article III § 5 of the by-laws which sets forth the order of business for all meetings of unit owners does not mention budget adoption, ratification or review.
When the board of directors adopted the annual budget for 1992, the monthly common charge was increased from $115.00 to $129.00. The same monthly charge remained in effect for 1993 but, in that year, there was a special assessment of $200.00 payable in two installments on July 1 and August 1. For 1994, however, the budget was increased and the monthly common charge was raised to $140.00. Also in 1994 the Board of Directors levied an additional charge of $100.00 for the cost of removing snow in the previous winter. The annual budget for 1995 was adopted at a meeting of the board of directors on November 12, 1994. In an announcement dated November 26, 1994 the members were informed of the budget and the increased monthly common charge, effective January 1, 1995, of $155.00.
In a letter dated October 23, 1995, the board of directors notified the unit owners of a shortfall in the 1996 budget. To remedy the situation, and to continue maintaining a proper reserve balance as well as keeping the monthly common charge at $155.00, the board of directors announced a special assessment of $255.00. The assessment was payable November 1, 1995 unless a unit member opted for the installment plan pursuant to which $100.00 was due November 1, $55.00 was due December 1, 1995 and $100.00 became due on January 1, 1996. Article V § 1 of the by-laws defines common expense for which a charge could be made to include such amounts as the board of directors may consider proper for the operation and maintenance of the complex "including without limitation an amount for working capital, a general operating reserve, a reserve fund for replacements and to make up any deficit in the common expenses for any prior year."
The defendants ignored the increase in the monthly common charge established by the board of directors for 1992 and paid $115.00 per month rather than $129.00 from January until July of 1992 after which no payments were made.
Non-payment of the common charges was admitted by the defendants. Linda Van Eck said they did not pay because they weren't getting services. Jan Van Eck's reason was more complicated. He stopped payment and offset against the common charges the damage that was done to his car by a ladder that was CT Page 4856 dropped on it and by a veterinarian's bill for one of his cats that was injured by a lawn mower.
The incident with the ladder occurred in the summer of 1992 when an employee of a concern hired by the plaintiff for work on the premises dropped a ladder on Jan Van Eck's automobile. When John Van Eck complained to Linda Levin, she said to take it up with the contractor. No invoice for repair of the vehicle was offered in evidence and there was no testimony as to what amount, if any, was spent to repair the car.
On September 10, 1992, one of the defendant's cats while on a leash outside of the unit was "run over" by a lawn mower of the company hired to cut the grass at the condominium. The cat was not cut but lost fur and had to be given tranquilizers. The veterinarian's bill was approximately $120.00. Linda Levin blamed the incident on the defendants who, she said, should not have had the cat on a leash.
Another facet of the plaintiff's lien is the fines imposed on the defendants for keeping their child's playhouse in a limited common area, for keeping more than two cats and for refusing to put parking stickers on their cars. The causes for the fines requires some explanation of unit and land use at Watch Hill.
The situation concerning the playhouse came into being in August, 1994, when Linda Levin received a complaint that the defendants had placed a child's playhouse on the area of lawn known as a privacy court adjacent to their unit. According to Article VII and exhibit A-1 of the plaintiffs Declaration of Condominium, privacy courts are not part of a unit but are limited common areas or elements. Section III(2) of the plaintiffs revised rules and regulations effective April 15, 1992 prohibits obstruction of common elements.
Accompanied by two board members, Linda Levin observed the placement of the playhouse. Her letter, dated August 31, 1994, written on behalf of the board, informed the defendants that if the playhouse were not removed by September 2, 1994, there would be a fine of $25.00 per day. In the letter, the defendants were also informed of their right of review by the plaintiffs appeals committee. The defendants did not remove the playhouse until September 28, 1994.
In August and September, 1993, the board of directors sent CT Page 4857 letters of complaint about the defendants' four cats and the leashing of them outside of the defendants' unit. Section III(5) of the revised rules and regulations limits unit owners to two household pets. The same section also prohibits the unattended leashing of pets on the outside of a unit. As with the succeeding letter about the playhouse, reference was made in this correspondence to the defendants' ability to seek review before the appeals committee. The controversy concerning the cats was never resolved and the defendants have continued to keep four cats in their unit.
A comprehensive resolution to govern parking in the condominium complex was adopted by the board of directors in September 1993. Part of a grassy common element near the defendants' unit was converted into two additional asphalt parking spaces despite their protest and a system of parking stickers was instituted. An additional regulation regarding parking stickers became effective on April 3, 1994. On August 24, 1994, one of the defendants' vehicles was noticed as not having a sticker. Two days later, Linda Levin, acting for the board, wrote to the defendants reminding them that without a sticker a vehicle could be parked only in a visitors' lot and if not so parked the vehicle could be towed and its owners fined. The defendants have never placed the authorized stickers on their cars. As explained by Jan Van Eck, the defendants refused to acknowledge the authority of the board of directors.
Section IX(E) of the revised rules and regulations provides for a warning to a unit owner on the first violation and for a fine of $25.00 upon receipt of a second written complaint or a subsequent observation by management of the same violation. The warning advises the unit owner that the fine "will be assessed for a continuing violation or a subsequent violation." The plaintiff assessed the fines on a continuing basis. Accordingly, the plaintiff claims that the defendants owe fines of $725.00 for the playhouse, $11,725.00 for the cats and $11,475.00 for their refusal to put parking stickers on their automobiles. In addition the defendants have been billed for common charges in the amount of $5,789.00, special assessments in the amount of $555.00 and a chimney flue inspection charge of $5.00.
In May 1993, the board of directors adopted a policy effective July 1, 1993 whereby a late payment fee of $10.00 is imposed on any common charge paid after the 15th day of the month in which it is due. The same policy also provides an interest CT Page 4858 charge at the rate of 1% on any unpaid balance existing on the 15th day of each month. To avoid possible conflict with applicable statutes, however, the plaintiff has foregone claims of interest and late charges for the fines and special assessments. Pursuant to General Statutes § 37-1 interest on delinquent common charges has been limited to .75% per month or 8% per year.
Most of the defendants complaints of a lack of services concerned claimed bypasses of their unit when repairs or renovations were accomplished especially with regard to their roof, a common element pursuant to Articles V, VI and VII of the Declaration of Condominium. Leaks in the roof started in 1992 when record ownership was still in Kathryn Phenix. Jan Van Eck's understanding of what Linda Levin told him was that since the defendants were not record owners, the plaintiff would do nothing for them. The roof was repaired by a contractor hired by the defendants in 1945 for $1031.78. Linda Levin attempted unsuccessfully to stop the work on the ground that it had not been authorized.
The defendants view the fines levied against them as "discriminatory prosecutions." References were made to a neighbor of Linda Levin who reportedly kept more than four cats and was not fined; to Maria Palmieri, a former member of the board of directors, who lives in the defendants' building and, according to them, has not been fined although she consistently flouts the parking and sticker regulations: and to other unit owners who have placed obstructions in their privacy courts, and who have not been fined for such actions.
Another area of disagreement was the maintenance by the board of directors of one or more reserve funds. The defendants were of the opinion that any money held in reserve had to be spent before the expiration of the fiscal year and if not it had to be returned to the unit owners. There are also some additional findings that appear in the next section of this memorandum.
 II.
Before proceeding further, the court must determine as a matter of law the efficacy of the defendants special defenses and counterclaims. The plaintiffs contention that the special defenses and counterclaims should be discarded comes from prior decisions which have relied on General Statutes §§ 47-78(a), CT Page 485947-244, 47-258 and Practice Book § 116. On the other hand, the defendants consider the instant action to be similar to the foreclosure of a mortgage. Based on this analogy, they believe that their alleged inequities provide them with defenses and claims for affirmative relief.
Undeniably a conflict exists in Superior Court jurisprudence as to the scope of permissible defenses and counterclaims that may be raised in a foreclosure action. Historically, opposition to a foreclosure has been limited to payment, discharge, release, satisfaction or the invalidity of the encumbrance. NationalMortgage Co. v. McMahon, 9 CSCR 300 (1994). But when the foreclosure is of a mortgage courts, principally on equitable considerations, have branched out and permitted defenses and claims for affirmative relief based on theories as diverse as mistake, accident, fraud, equitable estoppel, laches, tender of a deed in lieu of foreclosure, breach of the implied covenant of good faith and fair dealing, refusal to agree to a favorable sale to a third party and CUTPA.[1] Levi v. Kovacs, 5 CONN. L. RPTR. 260, 261 (1991); Bedford Plaza Ltd. Partnership v. Nakhai,
2 CONN. L. RPTR. 841, 842 (1990); see [Wllton] Wilton CrestCondominium v. Stern, 9 CONN. L. RPTR. 539, 8 CSCR 955, 956
(1993) (collecting cases).
When the foreclosure is by a condominium association against a unit owner and is predicated upon common charges, special assessments and other items made lienable by statute, the Connecticut cases do not exhibit diversity regarding special defenses and counterclaims. Their uniformity seemingly is derived from Gen. Stat. § 47-78(a) as well as §§ 47-244(a) and47-258. The latter two sections are made applicable to a pre-1984 condominium or common interest community, such as the plaintiff, by § 47-216.
Section 47-78(a) provides that a unit owner cannot exempt him or herself from liability for payment of common expenses by not using common elements or by abandoning the unit. A unit owner can be exempted only if every other unit owner is similarly excused. Section 47-244(a) allows a common interest community to impose charges or interest for the late payment of assessments and, after notice and an opportunity to be heard, reasonable fines for violation of the community's declaration, by-laws and rules and regulations. Section 47-258 grants a statutory lien on a unit for assessments levied against that unit or fines imposed against its owner from the date of delinquency. Unless the CT Page 4860 community's declaration provides otherwise, § 47-258
classifies fees, charges, late charges, fines and interest as assessments.
In Anchorage Condominium v. Smith, 1 CSCR 841 (1986), a suit for common charges, the court, on the authority of § 47-78(a), granted a motion to strike defenses of unit owners that alleged a failure by the condominium to make repairs in their unit and in external areas of the complex. Similarly, in WiltonCrest Condominium v. Stern, 9 CONN. L. RPTR. 539, 8 CSCR 925
(1993), a foreclosure of lien action, the court granted a motion to strike special defenses and a counterclaim wherein unit owners accused the plaintiff and its directors of failures to provide services, breaches of fiduciary duties owed to unit owners, breaches of covenants contained in the rules and regulations and a violation of CUTPA. In both cases, the reasoning is the same. Pursuant to § 47-78(a), unit owners are plainly liable for common charges. Where the language of a statute is plain and unambiguous, there is no place for construction and the statute should be applied as its words direct. Stitzer v. Rinaldi'sRestaurant, 211 Conn. 116, 118 (1989); Warner v. Leslie-ElliottConstructors, Inc., 194 Conn. 129, 134 (1984).
Of equal relevance are the discussions in Anchorage, supra
and Wilton Crest, supra concerning the impact of §§ 47-78(a),47-244(a) and 47-255 on the procedural law. In both cases it was held that the statutory scheme precluded special defenses and counterclaims of the type presented here from satisfying the same transaction requirement set forth for counterclaims in Practice Book § 116 and intimidated for special defenses by Practice Book § 133.
In the court's view, Anchorage, supra and Wilton Crest,supra, not only provide proper interpretations of Connecticut substantive and procedural law but, also, accord with the weight of authority. Trustees of Prince Condo Trust v. Prosser,592 N.E.2d 1301, 1302 (Mass. 1992) (there is no right to a set-off against lawfully imposed condominium charges); Newport WestCondominium Assn'. v. Veniar, 350 N.W.2d 818, 822 (Mich.App. 1984) (the Condominium Act does not provide a co-owner with the self-help remedy of withholding part or all of his assessed fees); Rivers Edge Condo. Ass'n. v. Rere, Inc., 568 A.2d 261, 263
(Pa.Super 1990) (nothing in Pennsylvania's Uniform Condominium Act supports nonpayment of assessments on a claim of failure to provide maintenance services); Abbey Park Homeowners Ass'n. v.CT Page 4861Bowen, 508 So.2d 554, 555 (Fla.App. 4 Dist. 1987) (when suit is to collect unpaid assessments, the affirmative defense of failure to maintain the common elements is inadequate as a matter of law). What this means, of course, is that with one exception the defendants' claims of fiscal or managerial mismanagement by the manager or the board of directors must await another day and be pursued either in their pending action or in a new suit brought for those purposes.
The exception involves the legality of the actions of the board of directors in establishing the common charges, interest, late fees and special assessments that the defendants have refused to pay. Previously noted was the notice for the 1992 unit owners' meeting which announced that three directors were to be elected to complete a five-person board. Thereafter, a board of directors consisting of five persons has continued in contravention of Article II § 1(a) of the by-laws which limits the number of directors to three. No Connecticut case precisely in point was found. In Fairfield County Turnpike Co. v.Thorp, 13 Conn. 173, 183 (1839), however, our Supreme Court said that where a majority of the directors were legally in their posts, it became incumbent upon those who claimed the vote of the directors was illegal to prove this fact. And in McCall v. ByranMfg., Co., 6 Conn. 427, 435-35a (1827), the language was to make someone a de facto officer there must be, at least, the form of an election although upon legal objections, the validity of the election could be overturned.
Decisions from other states, however, when read with these old Connecticut cases have convinced the court that too many directors, as distinguished from too few, do not invalidate a board's doings. In Smith v. Bayou Rentals, Inc., 345 So.2d 1229,1231 (La.App. 1977), five persons were elected directors although the corporation's charter specified a board of three. The five persons were considered to be de facto officers who would remain in that category until removed by proper corporate action. An election of an excessive number of directors is irregular and voidable and will be set aside and a new election ordered upon the complaint of a shareholder duly made. In re MultifadeCorporation of America, 97 N.Y.S.2d 609, 612 (1950). No comparable complaint has been brought challenging the number of persons on the plaintiffs board of directors. It necessarily follows, therefore, that the common charges and special assessments together with the late charges and interest thereon, all of which have been enacted by the board of directors, are proper CT Page 4862 components of the plaintiffs lien.[2]
A contrary conclusion has been reached regarding the fines. Fines at the rate of $25.00 per day came into being as part of a revision of the plaintiffs rules and regulations prepared by a committee and dated April 15, 1992. Unit owners and tenants were given notice of the new rules and regulations by the following letter.
April 15, 1992
Dear Association Member and Tenants:
 The Rules and Regulations Committee under the chairmanship of Barry Johnson-Fay has completed its task to revise the rules and regulations for Watchhill Condominiums. The final document is attached.
 The effective date of these documents is April 15, 1996. They supersede any other rules or regulations received by you in the past.
 Please keep them in a safe place for easy reference. Landlords are expected to provide a copy of the rules and regulations to each new tenant that occupies a unit at Watchhill.
Respectfully,
WATCHHILL CONDOMINIUM ASSOCIATION
According to Article II § 2(e) of the plaintiffs by-laws it is the board of directors who adopts and amends the rules and regulations covering the details and use of the property. The letter sent to the unit owners and tenants, however, does not mention any action of the board of directors. And in the welter of evidence produced in this case, there is nothing to indicate that the board of directors ever adopted the rules and regulations that were disseminated in April 15, 1992.
A condominium association is answerable to its by-laws and declarations. Southview Greens Condominium v. Finley,413 N.W.2d 554 (Minn. 1987). A condominium association may exercise its powers only within the constraints of its condominium declaration CT Page 4863 and by-laws. Eagan v. Mueller, 809 S.W.2d 411, 413 (Mo.App. 1991); Lion Square Phase II and III v. Hask, 700 P.2d 932, 934
(1985). Article II § 3 of the plaintiffs by-laws seemingly allows the board to delegate the adoption and amendment of rules and regulations to the manager. But by not offering proof of the board's valid adoption of the regulations that established the daily amount of the fines or a proper delegation of authority, the plaintiff is precluded from including the accumulated fines in its lien.[3]
 III.
The plaintiffs statutory lien includes costs and an attorneys fee incurred in its enforcement. General Statutes § 47-258(b). The only limitation on the attorneys fee is that it should be reasonable. Id. §§ 47-258(g); 47-77(a). As a concept, the reasonableness of an attorneys fee is dependent upon factors such the skill and standing of the attorneys employed, the nature of the controversy, the novelty and difficulty of the questions at issue, the usual and customary charges for the same or similar services and whether there is a reasonable connection between the fee charged and the litigation. 400 Condominium Association v.Wright, 608 N.E.2d 446, 448 (Ill.App. 1 Dist. 1992). See Buccinov. Cable Technology, Inc., 25 Conn. App. 676, 679-81 (1991) (discussion on some of the factors).
By affidavit and supplemental affidavit the plaintiff has requested an attorneys fee of $30,683.60. Based on the factors to be considered and the entries in the affidavits, the court cannot accept this sum as reasonable. A different approach such as earlier suits for money owed and executions thereon would have accomplished the same result with much less involvement. See 400Condominium, supra. The court. however, certainly agrees that the presence of the equitable defenses and counterclaims complicated and prolonged the trial. Based upon the trial and the entries in the affidavits, the court, in its discretion, Link v. Shelton,186 Conn. 623, 629 (1982), awards the plaintiff, as the prevailing party, the sum of $10,000.00 as a reasonable attorneys fee.
 IV.
The plaintiffs statutory lien may be foreclosed in the manner of a mortgage of real estate. General Statutes § 47-77. Accordingly the court finds the amount owed for common charges. CT Page 4864 special assessments, late fees and interest until June, 1996 to be $6,828.78 which when supplemented by the award of attorneys fees equals a debt of $16,828.78 plus taxable costs. From the uncontradicted testimony of the plaintiffs appraiser, the value of the defendant's unit is found to be $130,000.00.[4]
A judgment of strict foreclosure is ordered. The court will hear the parties on the setting of the law day[5] on the Monday immediately following the distribution date of this memorandum.
BARNETT, J.